**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SPECIAL COUNSEL, INC.<br>10151 Deerwood Park Boulevard<br>Building 200, Suite 400<br>Jacksonville, Florida 32256 | )<br>)<br>)<br>) | Case No. 1:20-cv-1615 |
| | ) | |
| and | ) | Demand for Jury Trial |
| | ) | |
| D4, LLC<br>10151 Deerwood Park Boulevard<br>Building 200, Suite 400<br>Jacksonville, Florida 32256 | )<br>)<br>)<br>) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| MATTER DISCOVERY, LLC<br>226 South Wabash Avenue, Suite 200<br>Chicago, Illinois 60604 | )<br>)<br>) | |
| | ) | |
| C/O Statutory Agent: Josh Kaplan<br>1765 North Elston Avenue, Suite 211<br>Chicago, Illinois 60642 | )<br>)<br>) | |
| | ) | |
| and | ) | |
| | ) | |
| EUGENE JOSEPH TENUTA<br>17609 Kelsey Lane<br>Orland Park, Illinois 60467 | )<br>)<br>) | |
| | ) | |
| and | ) | |
| | ) | |
| KOHLE TANNER FRANZEN<br>1140 West Lunt Avenue, Apartment 2A<br>Chicago, Illinois 60626 | )<br>)<br>) | |
| | ) | |
| and | ) | |
| | ) | |
| JUVENAL CARLOS ZAMUDIO<br>1033 West 14th Place, Unit 222<br>Chicago, Illinois 60608 | )<br>)<br>) | |
| | ) | |
| and | ) | |

|  | ) |
| --- | --- |
| CHRISTOPHER MEER ANGELO | ) |
| 2124 Burr Oak Lane | ) |
| Lindenhurst, Illinois 60046 | ) |
|  | ) |
| and | ) |
|  | ) |
| EDWARD ALBERT MEDINA, JR. | ) |
| 6243 West Grace Street | ) |
| Chicago, Illinois 60634 | ) |
|  | ) |
| Defendants. | ) |
|  | ) |

## COMPLAINT FOR INJUNCTIVE RELIEF AND MONETARY DAMAGES

Plaintiffs Special Counsel, Inc. and D4, LLC state for their Complaint against Defendants Matter Discovery, LLC, Eugene Joseph Tenuta, Kohle Tanner Franzen, Juvenal Carlos Zamudio, Christopher Meer Angelo, and Edward Albert Medina, Jr. (collectively "Defendants") as follows:

### PARTIES

1. Plaintiff Special Counsel, Inc. ("SCI") is a Maryland corporation with its principal place of business located at 10151 Deerwood Park Boulevard, Building 200, Suite 400, Jacksonville, Florida. SCI is a wholly-owned subsidiary of ADO Staffing, Inc. (U.S.), which is wholly-owned by Adecco, Inc. (U.S.). Adecco, Inc. is wholly-owned by Adecco AG (Switzerland). Adecco USA, Inc. is also wholly-owned by ADO Staffing, Inc.[1]

2. Plaintiff D4, LLC ("D4") is a New York LLC with its principal place of business at 10151 Deerwood Park Boulevard, Building 200, Suite 400, Jacksonville, Florida. Its members include Marcello Pozzoni, Gregory Holland, Steven Rudd, and Gerald Robinson, all of whom are citizens of Florida, and Laura Chamberlain who is a citizen of the District of Columbia. D4 maintains an office at 20 North Wacker Drive, Suite 3720, Chicago, Illinois 60606. On October 3,

---

[1]ADO Staffing, Inc., Adecco, Inc. (U.S.), Adecco AG (Switzerland), and Adecco USA, Inc. are collectively referred to as "Adecco."

2

2016, SCI purchased 100% of the member interest in D4. D4 is still in existence but all of its operating business was moved to SCI. D4 currently functions as a division of SCI.

3. Defendant Matter Discovery, LLC ("Matter Discovery") is an Illinois Limited Liability Corporation. Matter Discovery's principal place of business, main office, and headquarters are located at 226 South Wabash Avenue, Suite 200, Chicago, Illinois 60604.

4. Defendant Eugene Joseph Tenuta is an individual and a former employee of SCI who resides at 17609 Kelsey Lane, Orland Park, Illinois 60467.

5. Defendant Kohle Tanner Franzen is an individual, a former employee of SCI who resides at 1140 West Lunt Avenue, Chicago, Illinois 606026, and a current owner, principal, member, and/or employee of Matter Discovery.

6. Defendant Juvenal Carlos Zamudio is an individual, a former employee of SCI who resides at 1033 West 14th Place, Unit 222, Chicago, Illinois 60608, and a current owner, principal, and/or employee of Matter Discovery.

7. Defendant Christopher Meer Angelo is an individual, a former employee of SCI who resides at 2124 Burr Oak Lane, Lindenhurst, Illinois 60046, and a current owner, principal, and/or employee of Matter Discovery.

8. Defendant Edward Albert Medina, Jr. is an individual, a former employee of SCI who resides at 6243 West Grace Street, Chicago, Illinois 60634, and a current employee of Matter Discovery.

## JURISDICTION & VENUE

9. This Court has subject matter jurisdiction under 28 U.S.C. 1332(a) because: (1) there is complete diversity of citizenship between Plaintiffs and Defendants; and (2) the amount in controversy exceeds $75,000, exclusive of interests and costs.

10. The Court has pendant jurisdiction over the state-law claims under 28 U.S.C. 1367.

11. Venue is proper under 28 U.S.C. 1391 because all Defendants reside in this district and substantial events and omissions giving rise to the claims occurred here.

## FACTUAL BACKGROUND

**A. SCI and D4's Businesses and Their Legitimate and Protectable Interests in Protecting Their Relationships, Goodwill, Proprietary Information, Business Information, and Other Assets.**

12. SCI was founded in 1987 and is the nation's leading full-service provider of legal consulting, attorney recruiting, legal talent, legal technology, and eDiscovery solutions. (Ex. 1: William McGarry Declaration ("McGarry Dec."), ¶ 9). Beyond its tremendous size and scale, its strength comes from its ability to partner with clients and customers in creating solutions on a case-by-case basis. (Id.). This comes from fostering, furthering, and promoting the expertise of its people. (Id.). SCI operates throughout the United States and internationally. (Id.). It has over 50 offices in 22 states, including in Chicago at 20 North Wacker Drive, Suite 3720, Chicago, Illinois 60606, as well as in London and Shanghai. (Id.). SCI's affiliated companies and divisions include D4, Parker + Lynch Legal, EQ Legal Consulting, and SCI Legal Talent. (Id.).

13. Founded in 1997, D4 is a leader in the United States and internationally in data management and eDiscovery solutions, including the identification, collection, and production of electronically stored information. (Id. ¶ 10). D4 provides a full range of managed data and discovery services to law firms, corporations, and other clients. (Id.). D4's services include forensic analysis of ESI and electronic devices; expert testimony, and consulting; data identification, preservation, collection, recovery, reduction, processing, and analytics; predictive coding/technology assisted review (TAR); eDiscovery hosting services; legal software training; Office 365 Advanced eDiscovery; professional paper discovery solutions; international eDiscovery services; and managed services for IT infrastructure. (Id.). D4 was one of the first providers to offer an eDiscovery Managed services solution, which launched in 2011. (Id.). D4

maintains a strong presence and offices throughout the United States, as well as an office in Shanghai, China, and an office and "Strategic Business Unit" at 20 North Wacker Drive, Suite 3720, Chicago, IL 60606 ("D4 Chicago Office"). (Id.). D4's Chicago Office was formed after acquiring the existing business of Strategic Document Solutions, Inc. ("SDS") of which Tenuta was a 50% owner. (Id.).

14. D4 maintains a robust amount of proprietary data in its business including data regarding clients and customers, potential clients and customers, suppliers, and employees compiled over many years. (Ex. 3: Lee Albanese Declaration ("Albanese Dec."), ¶ 7). It has developed successful, proprietary, and confidential business strategies for capturing, analyzing, and effectively utilizing its proprietary information. (Id.). D4 has devoted substantial resources over the course of many years building a vast universe of existing and potential clients, suppliers, and employees, pinpointing decision-makers, cultivating relationships, learning, matching, and satisfying specialized needs and preferences, and negotiating creative arrangements and unique pricing. (Id.). The universe of potential clients for D4 services includes virtually every law firm, corporate legal department, and professional in the legal field, and D4 has cultivated goodwill with clients, potential clients, employees, and suppliers over the course of many years. (Id.).

15. D4's confidential and proprietary information includes its: existing and potential client identification, development, and tracking; strategies, criteria, and methodologies across a wide range of clients, industries, and markets; specialized training; key decision-makers and contacts and their needs, preferences, and requirements; corporate plans and strategies, financial information, new product plans and developments; marketing plans and projections; customer lists and prospects; confidential customer information; sales promotions and plans; advertising plans and policies; pricing policies and strategies; employee lists and personnel records; methods and

levels of compensation, revenue, profit, margin, pricing, cost, and billing information; creative service arrangements; employee information; supplier lists, information, and history; and other forms of non-public information developed or used by D4 and maintained on a confidential basis ("Confidential Information"). (Id. ¶ 8).

16. D4's Confidential Information is not publicly or readily available, not known or shared in the market, and D4 has legitimate and protectable interests in safeguarding it. (Id. ¶ 9). D4's Confidential Information, goodwill, and client, potential client, employee, and supplier relationships are unique, extremely valuable business assets, provide numerous competitive advantages in the market, and could be used by D4's competitors to unfairly compete. (Id.).

17. D4 exercises reasonable, diligent, and careful efforts to maintain the confidentiality of its Confidential Information, goodwill, and relationships including by: (i) storing Confidential Information in secure, password-protected databases and programs and on secure servers; (ii) requiring personalized passwords and/or two-factor authentication; (iii) limiting access rights to persons obligated to maintain the confidentiality and only to the extent necessary to perform their jobs; (iv) specialized training including security training and programming; and (v) requiring as a condition of employment compliance with employment agreements, its Colleague Handbook and Code of Conduct, and other policies and procedures on, among other things, issues related to information security, Confidential Information, confidentiality, conflict of interest, company devices, ethical concerns, and client information. (Id. ¶ 10). Also, employees within the D4 division are required—as a condition of their employment—to sign Confidentiality and Non-Competition agreements containing, among other restrictions, confidentiality, non-disclosure, non-competition, non-solicitation, and return of property provisions. (Id.).

**B. Tenuta, Franzen, Zamudio, Angelo, and Medina's Employment at SCI**

18. Tenuta worked in D4's Chicago Office for over five years, initially as Associate

6

Managing Director and then later as an Account Manager, from approximately October 17, 2014 until February 21, 2020. (Ex. 1: McGarry Dec. ¶ 11). As Associate Managing Director, he reported to the Chief Sales Officer and his compensation included a salary plus performance bonuses based on profitability targets and benefits. (Id.). His responsibilities included managing and overseeing: operational and office management functions; sales activity including corporate legal accounts; growth strategies; advancing and developing D4's industry position; policies, procedures, and systems to achieve company and customer goals including their development and enforcement; quality control policies, procedures, enforcement, and improvements; maintenance of facilities, capabilities, equipment, and staff; production environments; capacity planning; employee interviewing, hiring, performance, objectives, reviews, and training; and supplier relationships, supplies, and production equipment. (Id.).

19. Tenuta successfully grew D4's Chicago market position including by generating millions in yearly revenue and substantially increasing operating income, profitability and employee growth, was praised for his internal award-winning integration of the business he oversaw into the Special Counsel Organization formally recognized at an "All Stars" event, and developed a "loyal following with both internal and external clients." (Id. ¶ 12). He spent substantial time and effort developing and investing in his Sales Team, was part of D4's training program, secured client relationships, led business development strategy meetings, and implemented processes from other D4 strategic business units into D4's Chicago Office. (Id.). Tenuta serviced the Chicago metro and other markets. (Id.). He hired, or played in a substantial role in hiring, Franzen, Zamudio, Angelo, Medina, and numerous other employees in D4's Chicago Office. (Id.). Tenuta was involuntarily terminated on February 21, 2020. (Id.).

20. Franzen worked as an Account Manager in D4's Chicago Office for over five years

from October 2014–January 1, 2020. (Id. ¶ 13). Until Franzen resigned, which is explained in further detail below, he was one of four Account Managers in D4's Chicago Office. (Id.). He reported to the Managing Director, which was Tenuta, and his compensation structure included a base salary plus commissions. (Id.). His responsibilities included: selling D4's service offerings into new and existing accounts and servicing those accounts; working with new and existing clients to uncover opportunities to fulfill needs; generating and qualifying leads; obtaining and developing client referral sources; monitoring competitors, market conditions, and product development; cultivating and maintaining client relationships; achieving monthly revenue goals and maintaining a minimum standard of weekly activity; entertaining and networking with clients and potential clients; preparing sales action plans and schedules; planning and conducting marketing activities; monitoring and reporting sales activity; regional business development support, marketing, sales, and proposal strategy; conducting market research and surveys; participating in sales events; handling sales calls to new and existing customers; negotiating creative service arrangements with clients; developing sales proposals; creating and delivering Statements of Work; maintaining Sales Activity Reports; and managing sales inquiries and concerns including by phone, email, and in-person. (Id.). Franzen serviced the Chicago metro and other markets. (Id.).

21. Franzen was seen as one of D4's top producers. (Id. ¶ 14). He managed complex and unique service engagements, increased D4's market presence and awareness, nurtured and grew D4's work with some of its largest clients on numerous engagements, presented to large groups of existing and prospective clients, directly increased D4's bottom line profit, developed additional referrals from existing clients, spent substantial time and effort creating and growing opportunities, and generated revenue often in the six-figures on a monthly basis. (Id.).

22. Zamudio worked as a Client Services Specialist in D4's Chicago Office for over five

years from approximately October 17, 2014 to January 1, 2020. (Id. ¶ 15). He reported to the Managing Director, which was Tenuta, and his compensation structure included a base salary plus commissions. (Id.). His responsibilities included: directly communicating with, pursuing, maintaining, and servicing clients and client relationships; lead generation; fostering growth of the customer base; cultivating and referring client and project opportunities as they arose "through [his] constant interaction with customer base;" entertaining and networking with clients and potential clients; consulting with clients regarding job specifications; accurately documenting client requirements and orders; managing and personally performing client pick-up and deliveries; handling projects with little to no input; supervising aspects of the production staff; and supporting the Director, National Sales, Business Development, and Client Services Group. (Id.). Zamudio serviced the Chicago metro and other markets. (Id.).

23. Angelo worked in D4's Chicago Office for over four years from approximately August 19, 2015 to January 1, 2020 initially as a Production Supervisor and later as Operations Manager. (Id. ¶ 16). His responsibilities as Production Supervisor included: directing and coordinating projects; meeting client needs, preferences, timelines, requirements, and expectations; directly supervising Production and Quality Assurance Department including as to company policies and applicable laws; training and managing employees; planning, assigning, and directing work; performing a detailed overview of each new project; quality control; managing and assigning production schedules, equipment, and supplies to carry out project plans; daily reports and communications to the Operations Manager including status of daily production operations; daily review and reconciliation of project hours; carrying out company policies, procedures, and goals; and finalizing client projects. (Id.). Angelo serviced the Chicago metro and other markets. (Id.). He hired, or played in a substantial role in hiring, Medina and various other employees that worked

in D4's Chicago Office. (Id.).

24. Angelo handled a majority of the communication traffic into the D4 Chicago Office intake system, handled and manage complex and challenging engagements, served as a leader with important projects and key employees, was seen as a "supervisor with enormous potential," was instrumental in managing workflow from outside the office, developed and implemented processes to drastically reduce production response time, and utilized specialized guidance and training to manage key financial production metrics. (Id. ¶ 17).

25. Medina worked as a Production Assistant in D4's Chicago Office for over two years from approximately November 27, 2017 to January 1, 2020. (Id. ¶ 18). He reported to the Production Supervisor and Operations Manager, which was Angelo, and was responsible for: managing highly confidential client information; directly communicating with clients, potential clients, and suppliers; meeting client needs, preferences, timelines, requirements, and expectations; managing, implementing, and enforcing strict quality control processes; operating, maintaining, and repairing a fleet of commercial grade production machines; preparing client projects; supplier relationships, equipment, and supplies; implementing document finishing and distribution methods; carrying out company policies, procedures, and goals; and finalizing client projects. (Id.). Medina serviced the Chicago metro and other markets. (Id.).

26. While employed, Tenuta, Franzen, Zamudio, Angelo, and Medina directly contacted and worked with numerous long-standing and near-permanent client relationships of SCI and D4.

27. Tenuta, Franzen, Zamudio, Angelo, and Medina signed Applications for Employment acknowledging and agreeing: (i) that "as a condition of employment" they "may be required to sign a confidentiality, restrictive covenant, and/or conflict of interest statement;" (ii) to "CONFORM TO THE RULES AND REGULATIONS OF THE COMPANY;" and (iii) that they

"READ ALL OF THE INFORMATION CONTAINED IN THE APPLICATION." (Id. ¶ 19 and its Ex. 1-A: Applications) (emphasis in original).

C. **Tenuta, Franzen, Zamudio, Angelo, and Medina Agreed To Be Bound by Confidentiality and Non-Disclosure, Non-Competition, Non-Solicitation, and Other Restrictive Covenants as a Condition of Their Employment.**

28.  Tenuta, Franzen, Zamudio, Angelo, and Medina were provided with the means and resources to develop business and goodwill on behalf of SCI and D4, including through access to existing and potential clients, suppliers, and employees, specialized training, and the financial and other resources to develop these relationships. (Ex. 3: Albanese Dec. ¶ 11). They frequently used and accessed SCI and D4's Confidential Information, including through company databases, email, computers, and mobile devices. (Id.). They were also provided and given access to other specialized trainings, resources, and tools to perform their jobs, enhance their skills, and to further develop and maintain their relationships and goodwill with clients, potential clients, suppliers, and employees. (Id.). SCI and D4 would not have provided or given them access to these resources, trainings, and tools, had they known Tenuta, Franzen, Zamudio, Angelo, and Medina would not honor their Confidentiality and Non-Competition Agreements or other obligations. (Id.).

29.  Given the nature of D4's business, and the matters and projects it handles—including those Tenuta, Franzen, Zamudio, Angelo, and Medina handled during their employment—frequently involve voluminous business, commercial, medical, and personal information in electronic and paper form considered and/or expressly designed as confidential, sensitive, highly confidential, and/or trade secret. (Ex. 1: McGarry Dec. ¶ 21; Ex. 3: Albanese Dec. ¶ 12). This information is often strictly prohibited from disclosure by court order, state and federal law, contract, and/or common law. (Id.).

30. Because Tenuta, Franzen, Zamudio, Angelo, and Medina would be frequently accessing and using D4's Confidential Information and directly interacting with near-permanent

and long-standing clients, potential clients, suppliers, and employees—which they did during their employment—and given their roles and responsibilities, they were required as a condition of their employment and in consideration for their employment, compensation, benefits, and/or continued employment, compensation, and benefits by or from D4 and its "subsidiaries, affiliates, successors or assigns," they were each required to execute Confidentiality and Non-Competition agreements. (Ex. 1: McGarry Dec. ¶ 19, its Ex. 1-B: Confidentiality and Non-Competition Agreements for Angelo, Medina, Tenuta, and Zamudio, and its Ex. 1-C: Franzen ADP Policy Acknowledgment Report & New Hire Checklist). The terms and conditions they agreed to be bound by included, among other restrictions, confidentiality/non-disclosure, non-competition, non-solicitation, and return of property provisions, which D4 was employing them "in reliance upon [their] full compliance. . . ." (Id., at its Exhibit 1-B: Confidentiality and Non-Competition Agreement, p. 1).

31. ***Confidentiality & Non-Disclosure.*** They agreed to "carefully guard" and maintain the secrecy of D4's "Confidential Information." (Id., at its Exhibit 1-B, Sec. 2). This was defined as "all trade secrets and proprietary information, as they may exist from time to time, of D4 and information concerning the business, contemplated future business, prospects and any other affairs of D4 that D4 regards as confidential, proprietary, or private in nature, whether or not so labeled," including the following "highly valuable" examples:

> corporate plans and strategies, financial information, new product plans and
> developments, marketing plans and projections, customer lists and prospects,
> confidential customer information, sales promotions and plans, advertising plans
> and policies, pricing policies and strategies, employee lists and personnel records,
> methods and levels of compensation, supplier lists and other forms of non-public
> information developed or used by D4 and maintained on a confidential basis. (Id.).

32. They further acknowledged and agreed that: (1) unauthorized disclosure or use of Confidential Information could irreparably damage D4; (2) as employees of D4 they "have or will have access to (and receive compensation from D4 to use, develop and/or contribute to the

development of) such Confidential Information;" (3) they "shall not, at any time, either while [they] are employed by D4 or after the termination of [their] employment, disclose, in whole or in part, any Confidential Information to any person or entity for any reason or purpose whatsoever, or make use of any such Confidential Information for [their] own purpose or for the benefit of any person or entity in any way other than for the benefit of D4 and with its full knowledge and consent; and (4) "shall similarly keep confidential any information that belongs or pertains to any current or prospective D4 customer or client." (Id., at its Ex. 1-B, Sec. 1 & 2).

33. ***Non-Competition.*** They also agreed that for one year following their termination they:

> shall not, within a 100-mile radius of any D4 facility at which I worked during the final twelve months of my employment (the "*Territory*"), without the prior written consent of D4, directly or indirectly, whether as principal, agent, officer, director, consultant, employee, independent contractor or owner (other than the record or beneficial ownership of 5% or less of any corporation whose shares are publicly traded on a national securities exchange or in the over-the-counter market) of any person or entity, engage in, or render services or advice to, a Competitor. (Id. at Sec. 3).

"Competitor" is defined as any "person or entity that competes or is actively preparing to compete in the United States with any product, service or business of the unit, division or subsidiary of D4 by which I am (or was) employed." (Id.). They expressly acknowledged that this covenant is: (1) "necessary to protect D4's business interests, including its relationships with its customers and clients and its Confidential Information;" and (2) "does not prohibit [them] from working for or rendering services to a Competitor outside the Territory." (Id.).

34. ***Non-Solicitation***. The agreements prohibited them, for one year following their termination, from "directly or indirectly," on behalf of themselves or "any person or entity," from: (1) "solicit[ing] business from any actual or prospective customer or client of D4 with which [they] had contact during [their] employment at D4 employment;" (ii) "attempt[ing] to induce any such actual or prospective customer or client to terminate its relationship with D4;" and (iii) "hir[ing],

attempt[ing] to hire, solicit[ing] for employment, seek[ing] to retain on an independent contractor or consultant basis, or in any way encourage[ing] the departure, resignation, or other termination of employment of any employee of D4." (Id., at its Ex. 1-B, Sec. 4).

35. ***Business Reputation.*** They agreed that during their employment and "for all time thereafter" they would "not do any act, engage in any conduct, or make or publish any untrue or misleading statement that will demean or otherwise adversely affect the name, reputation, or business interests of D4." (Id., at its Ex. 1-B, Sec. 6).

36. ***Return of Property.*** They further agreed that upon termination they would "return to D4 all its property, including . . . keys, telephones, computers, PDAs, documents, records, electronic data and files, notes, papers, reports and customer and client lists, and shall not keep originals or copies of such property . . . ." (Id., at its Ex. 1-B, Sec. 7).

37. They also "acknowledge[d] and agree[d] that D4 may be without an adequate remedy at law should [they] breach this Agreement and [they], therefore, agree that, in addition to legal relief, D4, without needing to post a bond or other security, may enforce this Agreement by equitable relief including a temporary, preliminary and/or permanent injunction and/or specific performance." (Id., at its Ex. 1-B, Sec. 10). The agreements also had a "Voluntary Assent" provision stating:

> **I UNDERSTAND THAT THIS AGREEMENT CONTAINS SIGNIFICANT RESTRICTIONS WHICH, AMONG OTHER THINGS, PROHIBIT ME FROM WORKING FOR A D4 COMPETITOR DURING THE EFFECTIVE PERIOD HEREOF, AND I AM WILLING TO, AND DO ACCEPT SUCH RESTRICTIONS. I ACKNOWLEDGE THAT D4 HAS ADVISED ME TO SEEK THE ADVICE OF MY OWN LEGAL COUNSEL IF I AM UNSURE ABOUT THE EFFECT OF ANY OF THE OBLIGATIONS AND RESTRICTIONS IN THIS AGREEMENT. (Id. at Sec. 14) (emphasis in original).**

38. Before Tenuta's signed the Confidentiality and Non-Competition Agreement on March 16, 2015, he also signed an Employment Agreement dated October 16, 2014 where, among

other things, he agreed: (1) to "devote [his] full business time and reasonable best efforts to the business and affairs" of D4 and not to "engage in any other activity that could reasonably be expected to interfere with the performance of [his] duties, services and responsibilities;" (2) not to directly or indirectly use, disclose, or divulge any Confidential Information except as required in connection with his duties; (3) immediately deliver, upon termination or any Company request at any time and for any reason, all materials in his possession that contain or relate to the Company's Confidential Information and/or trade secrets; (4) not to directly or indirectly solicit, for one year following his termination, or "endeavor to entice away from the Company . . . or otherwise interfere with the business relationship of the Company with anyone that within a year was a customer or employee of, consultant or supplier to, or other person having material business relations with, the Company; (5) that violations of his confidentiality or non-solicitation obligations would result in irreparable injury and that the Company (and its affiliates, subsidiaries, parents, successors, and assigns) shall be entitled to apply for immediate injunctive relief enjoining him from engaging in breaches of breaches or other equitable relief to enforce these provisions; and (6) to award reasonable attorney fees and costs to the prevailing party. (Ex. 1: McGarry Dec. ¶ 19, and its Ex. 1-D: Tenuta Employment Agreement, Sec. 3, 5(a)–(b), 6, 7, 21).

39.  These restrictive covenants were sought in good faith and narrowly tailored to protect D4's legitimate and business interests in light of: the Confidential Information and trade secrets they would have had access to and did in fact access during their employment; that they would have direct and instrumental contact with existing and potential clients and customers including relationships they and others cultivated over long periods of time; the reasonable geographic limitations focused on where they primarily worked; the reasonable temporal limitations routinely upheld by courts; the special and unique services they offered; that the restrictions would not

unreasonably restrict their ability to secure gainful employment in their chosen occupations or impose undue hardship; and the lack of injurious harm to the public.

40. Absent these restrictions, SCI cannot adequately protect its legitimate and protectable interests in its Confidential Information, goodwill, client, potential client, employee, and supplier relationships, and other business assets, SCI's interests would be compromised, and competitors could use them to unfairly compete including by allowing a director competitor use its Confidential Information, goodwill, and relationships to unfairly compete.

**D. Other Agreements and Policies to Which Tenuta, Franzen, Zamudio, Angelo, and Medina Agreed as a Condition of Employment, and Further Resources Provided.**

41. Tenuta, Franzen, Zamudio, Angelo, and Medina each agreed to be bound by the Colleague Handbook and Code of Ethics. The Handbook, among other things, prohibited their use of Confidential Information, or information related to SCI's clients, potential clients, suppliers, and employees, for the benefit of themselves or any person or entity, and that they would not disclose any information regarding SCI's clients or potential clients except in performing their jobs at SCI. (Ex. 1: McGarry Dec., at its Ex. 1-F: Colleague Handbook Excerpts, p. 2).

42. By confirming they would abide by SCI's policies including all policies contained on SCI's intranet, Franzen, Zamudio, Angelo, and Medina further agreed that: (1) they would not "disclose business secrets or other confidential business plans, materials, financial data, or other non-public proprietary Company information;" (2) they would not "share confidential information regarding business partners, vendors, or customers;" (3) it was unacceptable to use Company computer, email, and internet system to share "trade secrets such as information regarding the development of systems, processes, products, know-how, technology, client or candidate lists, internal reports, procedures, or other internal business-related communications outside of the Company;" and (4) the policies apply to the use of email and the internet, including intellectual

property protection, privacy, misuse of Company resources, information and data security, and confidentiality and conflicts of interest. (Id., at its Ex. 1-F, pp. 2–3, 8–10, 15, 17).

43. Tenuta, Franzen, Zamudio, Angelo, and Medina each signed Voluntary Dispute Resolution and Arbitration Program for Colleague Agreements as a condition of continued employment. (Id. ¶ 20 and at its Ex. 1-E: Dispute Resolution Agreements). These established that all claims arising out of the parties' relationships shall be resolved by binding arbitration in the county in which they were last employed; however, they expressly permit temporary or preliminary injunctive relief from a court of competent jurisdiction as to claims otherwise covered by the arbitration requirement. (Id., at its Ex. 1-E, p. 2).

44. They also each underwent a Security Awareness and Training Program required for every employee, which was updated and presented annually and posted on the company intranet. (Id. ¶ 20 and at its Ex. 1-J: Security Awareness and Training Program). Through this training, Tenuta, Franzen, Zamudio, Angelo, and Medina confirmed they read, understood, and accepted the Access Authorization, Physical Access, Service Delivery, Security Incident Reporting and Response, Computer Use, and Password Policies. (Id., at its Ex. 1-J). They signed acknowledgments certifying completion of the Security Awareness and Training Program, which included an agreement to keep themselves aware of IT, HR, and other company security and policy requirements, participate in additional trainings and education and to "maintain the confidentiality of . . . client information." (Id. ¶ 20 and at its Ex. 1-K: Security Awareness and Training Acknowledgments).

45. They also signed Receipt of Equipment Agreements acknowledging receipt of company equipment and various devices, including company computers, cell phones, and/or other devices and items, and that "misuse or abuse of any D4 property or willful violation of the terms

17

of this agreement can result in personal financial liability and disciplinary action . . . per D4 Company Policy." (Id. ¶ 20 and its Ex. 1-L: Receipt of Equipment Agreements). Tenuta, Franzen, and others signed Cell Phone Allowance/BYOD Agreements agreeing to be bound by various terms of use, including to comply with all policies such as those "pertaining to data security, acceptable computing use, and email." (Id. ¶ 20 and its Ex. 1-M: Cell Phone Allowance/BYOD Agreements). They were also provided company credit cards and access to D4's Chicago Office van. (*See* id. ¶ 26).

### E. Defendants Set up a Business in Direct Competition with SCI for Over Five Months Before Their Coordinated Resignations While Using SCI and D4 Resources, Directly Soliciting D4 Clients and SCI Employees, and Concealing Their Conduct.

46. Matter Discovery's main office is located at 226 South Wabash Avenue, which is 0.8 miles away from D4's Chicago Office. (Id. ¶ 23, at its Ex. 1-P: Matter Discovery Website, and at its Ex. 1-Q: Google Maps).

47. Matter Discovery is a direct competitor of SCI and D4. (*See e.g.*, id. ¶ 55; Ex. 3, Albanese Dec. ¶ 27). Zamudio, while acting on behalf of Matter Discovery as its Director of Administration, expressly confirmed this—while directly soliciting SCI clients with whom he, Tenuta, Franzen, Angelo, and Medina directly contacted and worked with while employed by SCI—including through an email on January 21, 2020 when he stated, "I'm no longer with D4," "I have started my own company," "[w]e do everything that D4 offers including the tr[ial] boards, and I would like to retain your business." (Ex. 1: McGarry Dec. ¶ 39 and its Ex. 1-EE: New Company Email). Matter Discovery's website further confirms it is a direct competitor. (Id. ¶ 23 and its Ex. 1-P: Matter Discovery Website). For instance, it says its services focus in the area of eDiscovery, Forensics and Collections, and Paper Discovery and that it "handles everything from Data Management, Digital Investigations, to eDiscovery, and printing, copying and scanning for small to large law firms and corporate legal departments." (Id., at its Ex. 1-P).

48. Defendants secretly coordinated setting up Matter Discovery while employed by SCI. (Id. ¶ 55). The company was organized on August 1, 2019. (Id. ¶ 22 and its Ex. 1-O: Matter Discovery Corporation/LLC Search/Certificate of Good Standing). The "Principal Office," which differs from the main office it is currently operating from, matches Franzen's home address. (Id.). Its statutory agent is attorney Josh Kaplan. (Id.). This is the same attorney listed as counsel for Tenuta in his March 16, 2015 Employment Agreement with D4. (Id. ¶ 22, at its Ex. 1-O, and its Ex. 1-D: Tenuta Employment Agreement, p. 5). When Franzen told Tenuta about his plan to set up Matter Discovery, Tenuta referred him to Kaplan—which Tenuta recently admitted. (Id. ¶ 22). SCI did not have knowledge of Matter Discovery until well after Franzen, Zamudio, and Medina resigned and never consented to its creation or operation. (Id.).

49. Although Franzen is listed as the only LLC Manager, Zamudio—while acting for and on behalf of Matter Discovery—recently represented in an email that he was one of the individuals that "started [the] company." (Id. ¶ 40 and its Ex. 1-EE: New Company Email). This law firm client, which was a long-standing and near-permanent client relationship of SCI and D4 with whom Tenuta, Franzen, Zamudio, Angelo, and Medina directly contacted and worked with while still employed, is 0.9 miles from D4's Chicago Office. (Id. ¶ 40 and its Ex. 1-FF: Google Maps).

50. Tenuta, Franzen, Zamudio, Angelo, and/or Medina began planning, organizing, assisting, and working for or on behalf of Matter Discovery while all were still employed by SCI while using SCI resources, directly soliciting SCI clients and employees, and intentionally concealing their conduct in various ways. (Id. ¶¶ 24–43, 46–51, 55). This included designing and building a company website, soliciting proposals for office equipment and supplies including while using SCI resources, stockpiling cash to put into the business, stealing equipment and supplies from D4, ordering equipment and supplies from third parties, coordinating their resignations from

SCI, soliciting SCI clients and potential clients, and soliciting SCI employees to work for Matter Discovery. (*See* id.).

51. To intentionally conceal their conduct, Defendants conducted at least some preliminary planning and operations for Matter Discovery out of Franzen's home, purposely deleted emails from their SCI email accounts and data from SCI cell phones and other devices, frequently communicated by phone and in-person meetings, and conducted extensive business activities—including work that should have been solely for SCI at the time—from personal email accounts for and on behalf of Matter Discovery. (*See* id. ¶¶ 24–26, 31–34, 39–41, 48–46, at its Ex. 1-W: Forwarded Email, at its Exhibit 1-GG: Test Email, at its Exhibit 1-HH: Forwarded Email, at its Ex. I-NN: Angelo's D4-Issued Mobile Phone Records, at its Ex. 1-OO: Tenuta Email, and its Exhibit 1-PP: Tenuta-Herrera Email).

52. On November 19, 2029, Konica Minolta emailed Tenuta's SCI email account acknowledging receipt of an earlier email Tenuta sent and asking to set up a telephone call. (Id. ¶ 24 and its Ex. 1-R: 11/19/19 Konica Minolta Email). Tenuta responded to that email setting a call for November 20, 2019. (Id. ¶ 24, its Ex. 1-R, and its Ex. 1-S: Calendar Entry).

53. On November 22, 2019, Konica Minolta sent Tenuta's SCI account an email with two attachments: (1) "Matter Discovery Proposal.pptx;" and (2) "Specification Sheets Production." (Id. ¶ 25 and its Ex. 1-T: 11/22/19 Konica Minolta Email & Attachments). It thanked Tenuta "for the opportunity to earn [his] business," said who would be "handl[ing] the day to day operations," and identified a proposed fleet of commercial-grade, production-level printing, copying, scanning, and all-in-one machines. (Id.). The "Executive Summary" section of the "Matter Discovery Proposal.pptx" file says "Matter Discovery LLC is a legal discovery company providing services to the legal community throughout the United States." (Id.). It also referenced a prior call with

Tenuta and, after "looking at the past fleet used by a similar discovery company," it was "determined that Matter Discovery LLC would need" a "fleet" of main and backup production-level devices, which, among other needs would handle the bulk of their printing needs, allow scanning wide format materials. (Id.). This refers to the fleet of machines in D4's Chicago Office. (Id.). These communications were for Matter Discovery, nothing about them were for or on behalf of SCI, and they were conducted with the knowledge and/or at the direction of Defendants. (Id.).

54.   D4's Chicago Office leases a van to assist with transportation and delivery of projects to and from customers. (Id. ¶ 27; Ex. 3: Albanese Dec. ¶ 16). It is parked at a garage near D4's Chicago Office and is required to be parked there when not being used for authorized D4 business. (Ex. 1: McGarry Dec. ¶ 27). Tenuta has a key and Angelo also had access to the vehicle. (Id.). It would be highly unusual for the D4 van to be out of the garage for more than a handful of consecutive hours, and extremely unusual to be out for a whole day or more. (Ex. 3: Albanese Dec. ¶ 16). On November 21, 2019, the van exited the garage and did not return until November 22, 2019 at 8:20AM CST. (Ex. 1: McGarry Dec. ¶ 28 and its Ex. 1-U: Garage Access Logs). Tenuta used the van to meet with Konica Minolta on behalf of Matter Discovery. (*See* id. ¶ 28).

55.   In early December 2019, Angelo—with the knowledge and/or at the direction of Defendants—directly solicited SCI Production Assistant Virgie Conanan by offering her a job at a new business venture, which she declined. (Ex. 2: Virgie Conanan Dec., ¶ 4; Ex. 1: McGarry Dec. ¶ 30). This new business venture was Matter Discovery.

56.   Those who work in D4's Chicago Office have badges they must use to swipe to gain access, and the date and time of each swipe is recorded in an access log. (Id. ¶ 29). From October 25, 2019–December 10, 2019, Tenuta did not swipe in a single time. (Id. ¶ 29 and its Ex. 1-V: Tenuta's Badge Access Log).

21

57. On December 26, 2019 at 4:59 PM CST, Zamudio sent an email from his SCI email account to his personal email account forwarding himself files a D4 Client, which was a long-standing and near-permanent client relationship with whom Tenuta, Franzen, Zamudio, Angelo, and Medina directly contacted and worked with while still employed, submitted to D4's production email account. (Id. ¶ 31 and its Ex. 1-W: Forwarded Email). The initial email shows that a D4 client submitted a job request to the Hightail secure file-sharing service, which automatically issues a job request via email to D4's production box and employees including Franzen, Zamudio, Angelo, and Tenuta. (Id.).

58. On December 31, 2019, this same D4 client submitted three separate job requests via Hightail to D4's production box. (Id. ¶ 32). No job ticket was created for these requests nor were they entered into D4's manual log. (Id.). This is unusual as D4's practice was and is to create a job ticket for all submissions that come in and to later void out the ticket if the request is cancelled or otherwise terminated. (Id.). That same day, Franzen, Zamudio, and Medina all swiped into D4's Chicago Office using their badge and all three had access to D4's production inbox. (Id. ¶ 32 and its Ex. 1-X: Franzen, Medina, and Zamudio's Badge Access Logs). This client usually submitted job requests via Hightail; however, beginning in January 2020, Tenuta began submitting the client's requests via Hightail himself. (Id. ¶ 33). At various points, including on January 13, 2020, D4's Chicago Production email account shows Tenuta submitted a request on behalf of this D4 client. (*See* id., at its Ex. 1-Y: 1/13/20 Tenuta Email). The directions for these and other requests state that "Gene [Tenuta] will deliver tomorrow," which allowed Tenuta or Angelo to deliver the requests on behalf of Matter Discovery and not D4. (*See* id.).

59. On December 26, 2019, the D4 van exited the garage at 9:47 AM CST and did not return until December 27, 2019 at 11:15 AM CST. (Id. ¶ 34 and at its Ex. 1-U: Garage Access

Log). On December 26, 2019, Angelo placed 2 calls to Zamudio at 10:00 AM CST and 11:18 AM CST. (Id. ¶ 34 and at its Ex. 1-NN: Angelo's Call History). On December 27, 2019, Angelo placed 3 calls to Zamudio at 12:03 AM CST, 2:06 PM CST, and 4:22 PM CST; 1 call to Franzen at 12:00 PM CST; and 1 call to Tenuta at 12:06 PM CST. (Id.). On December 30, 2019, the van was gone from the garage for about 6.5 hours. (Id. ¶ 34 and at its Ex. 1-U: Garage Access Log). On December 30, 2019, the van exited the garage at 5:22 PM CST and did not return until December 31, 2019 at 12:25 PM CST. (Id.).

**F. Defendants Coordinate and Stagger Their Resignations While Further Concealing Their Conduct To Give Them More Time To Directly Solicit SCI Clients and Employees, Obtain Equipment and Supplies, and Utilize SCI Resources.**

60. The Matter Discovery website formally launched on or around December 31, 2019.

61. On December 31, 2019, Franzen, Zamudio, and Medina formally submitted their voluntary resignations effective immediately and without advance notice. (Id. ¶ 35). To further conceal Defendants' conduct, provide more time to solicit SCI clients and employees, obtain equipment and supplies from SCI and third-parties, and utilize SCI resources, Franzen's resignation email, sent at 12:31 PM CST, thanked SCI for the "opportunity to grow this amazing company" and said his time at SCI was "nothing short of amazing for [him]self personally and professionally." (Id., at its Ex. 1-Z: Franzen Resignation Email). He made no reference to his creation of Matter Discovery, his work there while employed by SCI, or that he was or would be working there. (Id.). Franzen's email also provided instructions for paying his December commission (to be paid on January 31, 2020) and final paycheck. (Id.). Franzen also provided instructions for payment of his December commission (to be paid on January 31, 2020) and final paycheck. (Id.). His last paycheck was issued on January 17, 2020. (Id.). Just before Franzen sent his resignation, at 12:07 PM CST, Zamudio called Angelo. (Id. at its Exhibit 1-NN: Angelo Call History).

62. D4 owns several hand trucks dollies used to transport boxes when delivering projects to customers. (Id. ¶ 36; Ex. 3: Albanese Dec. ¶ 21). One was reported missing on January 2, 2020 and it still has not been located. (Id.).

63. On January 6, 2020, Tenuta suggested to Aaron Duncan, SCI Vice President of Discovery Services, and Jason Schroeder, Operations Director Local Discovery Center, that SCI should "shut this place down" while referring to D4's Chicago Office. (Ex. 1: McGarry Dec. ¶ 37). At 5:59 PM CST that day, Tenuta called Angelo. (Id. at its Ex. 1-NN: Angelo Call History).

64. On January 7, 2020, Tenuta sent a calendar invite for a "Transition Meeting." (Ex. 4, Eberardo Herrera Declaration ("Herrera Dec."), ¶ 11 and its Exhibit 4-B: Calendar Invite). During this meeting, Tenuta directed D4's production staff employees: (1) not to directly communicate with any of Franzen's clients directly and that all client communications needed to go through Tenuta, which was unusual given their frequency and history of direct client interactions; (2) not to use the boxes D4 typically used with its company logo, and to use blank boxes without D4's logo instead, when delivering projects to clients. (Id. ¶ 11; *see also* Ex. 1: McGarry Dec. ¶ 51). Around this same time, Tenuta told the various D4 employees to start looking for new jobs because D4's Chicago Office would not be open much longer. (Ex. 4: Herrera Dec., ¶ 11; *see also* Ex. 1: McGarry Dec. ¶ 51). Tenuta spoke with Medina several times shortly before Medina resigned. (Ex. 3, Albanese Dec. ¶ 24; Ex. 1: McGarry Dec. ¶ 51).

65. On January 8, 2020, Angelo placed an order with one of D4's vendors for supplies. (Id. ¶ 38). Instead of having the supplies delivered, which was the usual practice, Angelo and Tenuta picked up the supplies in the D4 van. (Id.). When they returned to the office, Angelo asked another employee, Lead Production Assistant Eberardo Herrera, to assist with unloading. (Id.; Ex. 4: Herrera Dec. ¶ 5). At 5:27 PM CST, Angelo placed a call to Zamudio, who resigned the week

prior, which lasted 4 minutes. (Ex. 1: McGarry Dec., at its Ex. 1-NN: Angelo Call History). A few days later, Herrera reviewed the underlying invoice and recalled only seeing about half of the supplies reflected on the invoice when he was asked to help unload a few days earlier. (Ex. 4: Herrera Dec. ¶ 5; *see also* Ex. 1: McGarry Dec. ¶ 38). This is one of many instances where Defendants funneled supplies ordered and paid for by SCI to Matter Discovery to use in competition with SCI. (*See*, *e.g.*, Ex. 1: McGarry Dec. ¶¶ 33, 36, 38–39).

66.  The garage access log shows the D4 van exited the parking garage where it was stored at 9:24 AM CST on Friday January 10, 2020 and returned at 7:02 PM CST on Sunday January 12, 2020. (Id. ¶ 39 and at its Ex. 1-U: Garage Access Log). At 4:12 PM CST on January 10, 2020, Tenuta called Angelo. (Id. at its Ex. 1-NN: Angelo Call History). D4 recovered two documents from inside its van: (1) a January 10, 2020 parking ticket for parking in a commercial loading zone issued at 4:21 PM CST; and (2) a January 11, 2020 parking garage receipt issued at 10:22 AM CST. (Id. ¶ 39, at its Ex. 1-AA: Parking Ticket, and at its Ex. 1-BB: Parking Garage Receipt). The address on the parking ticket is 232 S. Wabash Ave., which is 135 feet from Matter Discovery's office. (Id. ¶ 39 and at its Ex. 1-CC: Google Maps) The address on the parking garage receipt is 231 S. Wabash Ave., which is 292 feet from Matter Discovery's office. (Id. ¶ 39 and at its Ex. 1-DD: Google Maps). During these times, Franzen, Zamudio, Angelo, Tenuta, and/or Medina used D4's company van for Matter Discovery's business. (*See* id. ¶ 39).

67.  On January 21, 2020, Zamudio sent an email from his SCI account with the subject "New Company" to a law firm client of SCI—which was a long-standing and near-permanent client relationship with whom Tenuta, Franzen, Zamudio, Angelo, and Medina directly contacted and worked with while still employed—stating "I'm no longer with D4," "I have started my own company," "[w]e do everything that D4 offers including the tr[ial] boards, and I would like to

retain your business." (Id. ¶ 40 and its Ex. 1-EE: New Company Email). This D4 law firm client is located at 150 N Michigan Ave #1100, Chicago, IL 60601. (Id. ¶ 40). This is 0.9 miles from D4's Chicago Office. (Id., at its Ex. 1-FF: Google Maps). Also on January 21, 2020, Angelo called Franzen at 9:12 AM CST, called Konica Minolta at 11:20 AM CST, and called Franzen again at 11:27 AM CST. (Id., at its Ex. 1-NN: Angelo Call History).

68.  On January 20 and January 31, 2020, Tenuta forwarded emails from his SCI email account to his personal email account attaching D4's Standard Statement of Work Agreement and a Pricing Estimate for one of its clients. (Id. ¶ 41, at its Ex. 1-GG: Test Email, and at its Ex. 1-HH: Tenuta Email). This was a long-standing and near-permanent client relationship with whom Tenuta, Franzen, Zamudio, Angelo, and Medina directly contacted and worked with while still employed.

69.  For a D4 client located at 444 West Lake Street, Suite 900, Chicago, IL 60606, which was a long-standing and near-permanent client relationship with whom Tenuta, Franzen, Zamudio, Angelo, and Medina directly contacted and worked with while still employed, D4's records reflect 14 job tickets (6 in December 2019, 8 in January 2020) for which it does not have a corresponding invoice or any record of payment for the jobs. (Id. ¶ 42; Ex. 3, Albanese Dec. ¶ 18). On January 22, 2020 at 10:29 AM CST, the client submitted a request via Hightail to D4's Chicago Production email account requesting a production job involving single-sided legal documents, which was assigned Opportunity No. 25-0120-113. (Ex. 1: McGarry Dec. ¶ 42 and at its Ex. 1-II: Single-Sided Print Request; Ex. 3, Albanese Dec. ¶ 18). At 11:24 AM CST, Tenuta submitted a separate job request via Hightail to D4's Chicago Production email account requesting double-sided versions of the same document. (Id. ¶ 42 and at its Ex. I-JJ: Double-Sided Print Request; Ex. 3: Albanese Dec. ¶ 18). During a meeting with this client on February 27, 2020, the client indicated

that it submitted the second request for the double-sided production job to Matter Discovery and not D4. (Ex. 1: McGarry Dec. ¶ 42). This client also indicated that it had a call with Franzen from Matter Discovery about this job, that Franzen sent an email about it, and that Matter Discovery delivered the single-sided production job, which was sent only to D4. (Id.).

70.  For a D4 client located at One North Franklin, Suite 1900, Chicago, Illinois 606006, which was a long-standing and near-permanent client relationship with whom Tenuta, Franzen, Zamudio, Angelo, and Medina directly contacted and worked with while still employed, D4's records reflect 31 job tickets (23 in December 2019, 8 in January 2020) for which it does not have a corresponding invoice or any record of payment for the jobs. (Ex. 1: McGarry Dec. ¶ 43; Ex. 3: Albanese Dec. ¶ 19). D4's records show either Angelo or Tenuta would be the ones to deliver these projects. (Id.). For this same client, D4's Chicago Office production inbox records reflect three job submissions for December 31, 2019—the same day Franzen, Zamudio, and Medina resigned. (Ex. 1: McGarry Dec. ¶ 32; Ex. 3: Albanese Dec. ¶ 20). D4's records do not reflect job tickets written up for these job submissions, which would be extremely unusual given how it was and is managed. (Id.). The badge records show Franzen (arrived 9:59 AM CST), Zamudio (arrived 10:01 AM CST), and Medina (arrived 10:52 AM CST) were in the office that day and that Tenuta was not. (Ex. 1: McGarry Dec. ¶ 32 and its Ex. 1-X: Badge Access Logs).

71.  On February 1, 2020, Angelo formally submitted his voluntary resignation effective immediately. (Ex. 1: McGarry Dec. ¶ 44 and at its Ex. 1-LL: Angelo Resignation Email). To further conceal his conduct, provide Defendants more time to solicit SCI clients and employees, obtain equipment and supplies from SCI and third-parties, and utilize SCI resources, Angelo's resignation email falsely cited "personal" and "family" matters he needed to take care of immediately. (Id.). In a part of the email directed to Tenuta, he said:

27

> Gene, Thank you for giving me a[n] opportunity to work with you and your Chicago Team, You still have a great team behind who will help you restart our D4 Chicago Office. I will not disappear from here, I will be in the office Monday morning to hand you some stuff . . . .

(Id.). Angelo also falsely said he was returning to DTI, LLC—where he worked before SCI. (Id.).

72. When a job or order comes in from a client at D4's Chicago Office, it comes into a centralized email account, ChicagoProduction@D4discovery.com, to which Tenuta, Franzen, Zamudio, Angelo, and Medina all had access and used frequently. (Ex. 1: McGarry Dec. ¶ 45; Ex. 4: Herrera Dec. ¶ 7). When a new job comes into this account, the person managing the centralized inbox on a particular day generates a job ticket for each request and sequentially assigns a job number. (Id.). The job tickets and numbers are recorded in a manual log. (Id.). The job is either given to the Production Supervisor or the Production Lead to complete or to assign to a Production Assistance for completion. (Id.). Upon completion of the job, the job ticket, meter sheet(s), and support for other billable items are reviewed by the Production Supervisor. (Id.). Once approved, the package is given to the appropriate Account Manager for pricing. (Id.). At this time, the Account Manager enters the job into the D4 SalesForce instance and the job is assigned an opportunity number by the software. (Ex. 1: McGarry Dec. ¶ 45). Priced job tickets are then provided to the Production Lead and the billables/metrics are input into the D4 Chicago LDC SalesForce instance for the applicable opportunity. (Id.). The billable job data is exported from SalesForce by the Service Center Billing Department (located in Jacksonville, FL), and is loaded into the PeopleSoft Financials (v8.4) Billing sub-leger, and the client is invoiced accordingly. (Id.).

73. In late January 2020, Herrera learned that part of D4's manual log was missing and he asked Angelo about it. (Ex. 1: McGarry Dec. ¶ 46; Ex. 4: Herrera Dec. ¶ 8). After their conversation, Angelo went to speak with Tenuta and reported back to Herrera that Tenuta had taken the logs without further explanation. (Id.). At a later time, when Tenuta was interviewed and

asked why he took the logs, he said he took them home and was working on a request from a client regarding missing client matter numbers on invoices. (Ex. 1: McGarry Dec. ¶ 46). This is illogical because the job ticket is needed to reconcile any billing/invoice detail issues. (Id.). Tenuta returned part of the manual log but much is still missing. (Id.).

74. Although D4 has diligently attempted to compile the missing parts of the log from other sources of information—some of which Tenuta and Angelo are not believed to have known existed while at D4—61 job tickets from January 2020 are missing totaling $11,500. (Id. ¶ 46 and its Ex. 1-MM: Recreated January 2020 Job Tickets; Ex. 4: Herrera Dec. ¶ 9). Another 57 from December 2019. (Id. ¶ 46; Ex. 4: Herrera Dec. ¶ 9). The missing tickets are for D4 clients that Franzen, Zamudio, Angelo, Tenuta, and Medina directly contacted and worked with while still employed. (*See* Ex. 1: McGarry Dec. ¶ 46; Ex. 4: Herrera Dec. ¶ 9). D4 reasonably believes various other job tickets from the prior months are also missing. (Ex. 1: McGarry Dec. ¶ 46). At least one D4 client has followed up about missing invoices. (Id.). The missing log, coupled with the missing job tickets creates an opportunity for work completed and delivered by D4 to not be billed by D4, and/or for another entity (*i.e.*, Matter Discovery) to bill D4 clients for this work. (Id.).

75. Besides the missing tickets, the total D4 job opportunities or new requests from clients has also decreased. (Id. ¶ 47). There were 192 opportunities for August 2019, 199 for September 2019, 211 for October 2019, 144 opportunities for November 2019, 132 for December 2019, and 145 for January 2020. (Id.). The drop off stems from Defendants, among other things, taking D4's opportunities and allowing Matter Discovery to complete the requests or processing jobs through D4 that were delivered by, invoiced by, and paid to Matter Discovery. (*See* id.).

76. Angelo had been using a D4-issued cell phone and, at or around the time of his resignation, he gave it to Tenuta. (Id. ¶ 48). Prior to handing it over, Angelo stopped using his

phone on January 23, 2020 and intentionally wiped its history and data. (*See* id. ¶ 48). The call history records show Angelo had 14 calls with Franzen in November 2019, 22 calls with him in December 2019, and 37 calls with him in January 2020 (59 of which were after Franzen resigned). (Id., at its Ex. 1-NN: Angelo Call History Records). It also shows Angelo had 4 calls with Tenuta in November 2019, 3 calls with him in December 2019, and 16 calls with him in January 2020. (Id.). It also shows that Angelo had 10 calls with Zamudio in December 2019 and 19 calls with him in January 2020. (Id.). Finally, it shows that Angelo had 9 calls with Konica Minolta in November 2019 and 4 calls in January 2020 (Id.).

77. Leading up to their resignations, they showed up to work less, were frequently late, and slowed down or stopped servicing or pursuing clients, potential clients, and supplier relationships. (*See* id. ¶¶ 47, at its Ex. 1-V: Tenuta Badge Access Log, and at its Ex. 1-X: Franzen, Medina, and Zamudio Badge Access Logs). Matter Discovery, Franzen, and Zamudio directly solicited Medina, Angelo, and others to work there while employed by SCI knowing this would violate their restrictive covenants and various other obligations. After their employment with SCI ended, Tenuta, Franzen, Zamudio, Angelo, and Medina have continued to work for and on behalf of Matter Discovery in the prohibited Territory.

### G. Defendants' Conduct Following Franzen, Zamudio, Angelo, and Medina's Coordinated and Staggered Resignations

78. On February 6, 2020, Tenuta met with a large D4 client and shortly after he emailed Herrera asked for D4's pricing information for this client. (Ex. 1: McGarry Dec. ¶ 49, at its Ex. 1-OO: Tenuta Email, and its Ex. 1-PP: Herrera-Tenuta Email; Ex. 4: Herrera Dec. ¶ 6 and its Ex. 4-A). Tenuta did not inform his supervisor of this meeting at the time as was the regular practice. (Ex. 1: McGarry Dec. ¶ 49).

79. On February 7, 2020, a law firm client reported a conversation with Zamudio where

Zamudio had "reach[ed] out" about he and Franzen "creat[ing] their own business – Matter Discovery." (Ex. 1: McGarry Dec. ¶ 50 and its Ex. 1-QQ: 2/7/20 Email; Ex. 3: Albanese Dec. ¶ 23 and its Ex. 3-C: 2/7/20 Email). The law firm client, which was a long-standing and near-permanent client relationship with whom Tenuta, Franzen, Zamudio, Angelo, and Medina directly contacted and worked with while still employed, is located at 10 S Riverside Plaza, Chicago, IL 60606—0.2 miles from D4's Chicago Office. (Ex. 1: McGarry Dec., ¶ 50 and at its Ex. 1-SS).

80.    On February 21, 2019, Tenuta was terminated by SCI. (Id. ¶ 52).

81.    Matter Discovery's website lists a "Houston" office on its website, though no physical address for an office is listed. (Id. ¶ 54 and its Ex. 1-P: Matter Discovery Website; Ex. 3: Albanese Dec. ¶ 26 and its Ex. 3-E: Matter Discovery Website). A large client of D4's Chicago Office with an office at 30 South Wacker Drive, Suite 900, Chicago, which was a long-standing and near-permanent client relationship with whom Tenuta, Franzen, Zamudio, Angelo, and Medina directly contacted and worked with while still employed, does substantial business is in Houston, Texas. (Ex. 1: McGarry Dec. ¶ 54). While employed by SCI, Tenuta suggested opening a Houston office. (Id.).

82.    From when Matter Discovery was created on August 1, 2019 through their final payments from D4: (1) Franzen was paid $47,729.92 in salary plus $33,782.55 in commissions; (2) Zamudio was paid at least $16,510.44 in salary alone; (3) Medina was paid at least $12,135.66 in salary alone; (4) Angelo was paid $30,181.84 in salary alone; and (5) Tenuta was paid $48,897.87 plus $4,720.79 in commissions. (Id. ¶ 53).

83.    Matter Discovery, Franzen, Zamudio, Angelo, and Medina stockpiled SCI's Confidential Information, business information, and/or trade secrets, including in their personal email accounts, to assist Matter Discovery in competing with SCI and to solicit SCI's clients,

potential clients, employees, and suppliers. (*See* id. ¶¶ 31–33, 41, 49, at its Ex. 1-W: Zamudio Email, at its Ex. 1-HH: Tenuta Email, and at its Ex. 1-PP: Tenuta-Herrera Email; Ex. 4: Herrera Dec. ¶ 6, at its Ex. 4-A: Tenuta-Herrera Email). They also deleted emails, data from cell phones and other devices, documents, and other potentially discoverable evidence to conceal their conduct. (*See* id. ¶¶ 25, 42–43, 46, 48, at its Ex. 1-T: 11/22/19 Tenuta Email; at its Ex. 1-NN: Angelo Call History; Ex. 3: Albanese Dec. ¶¶ 18–19; Ex. 4: Herrera Dec. ¶¶ 8–9).

84. On February 14, 2020, SCI sent Franzen, Zamudio, and Angelo letters explaining SCI's understanding that were are employed with Matter Discovery in direct competition in the prohibited Territory, as well as SCI's concern about compliance with their non-solicitation obligations. (Ex. 5: Tyler Tarney Declaration ("Tarney Dec."), ¶ 3 and at its Ex. 5-A: 2/14/20 Franzen, Zamudio, & Angelo Letters). SCI asked that they immediately cease and desist breaching their obligations and provide several requested confirmations by February 20, 2020. (Id.). SCI sent similar letters to Matter Discovery and Medina on February 20, 2020 requesting similar confirmations by February 25, 2020. (Id. ¶ 4 and its Ex. 4-B: 2/20/20 Matter Discovery & Medina Letters). Franzen, Zamudio, Angelo, and Medina failed to provide any of these confirmations by the requested deadlines. (Id. ¶ 5 and its Ex. 5-C: Tarney/Kreeger Emails). This refusal and these communications reflect that—despite the avalanche of evidence—they refuse to honor their obligations, do not take them seriously, and will continue to violate them. (Id. ¶¶ 3–5 and its Ex. 5-C, Emails and its Ex. 5-D, 2/28/20 Letter).

85. Through a February 28, 2020 letter from Franzen, Zamudio, Angelo, and Medina's counsel, they: (1) conceded that Franzen, Zamudio, Angelo, and Medina are working at Matter Discovery; (2) falsely stated that (i) they reached agreements to work there after resigning, (ii) Zamudio, Angelo, and Medina "were not involved with the solicitation of . . . clients" for Matter

Discovery, rather only Franzen did this, (iii) Zamudio, Angelo, and Medina "were not involved with the solicitation of each other" for Matter Discovery, rather only Franzen did this; and (3) they did not intend to retain D4 Confidential Information, but "it is their impression that the lack of formal exit procedures" may have led to the "inadvertent retention" or "destruction of inadvertently retained Confidential Information,'" none of which has been identified or produced to D4 or SCI to date. (Id. ¶ 5 and its Ex. 5-D, 2/28/20 Letter).

86. Defendants' brazen conduct is exactly the type of conduct that would enable a competitor to unlawfully target SCI and D4's clients, potential clients, suppliers, and employees and grievously harm SCI and D4's business. Considering Defendants' conduct, their knowledge of and relationships with SCI and D4's clients, potential clients, suppliers, and employees, and the relationships, goodwill, Confidential Information, and other assets at stake, SCI and D4 are at imminent risk of immediately losing substantial business and relationships, losing clients, potential clients, suppliers, and employees and of further use or disclosure of SCI and D4's Confidential Information by a direct competitor. SCI and D4 will continue to suffer, irreparable harm for which no adequate remedy at law exists given that SCI and D4's current loss is presently impossible to quantify, and has been left with no choice but to file suit and seek, among other things, immediate injunctive relief.

87. The investigation into Defendants' activities is ongoing. SCI plans to use additional evidence from its investigation to further support its existing allegations, claims, and requests for injunctive relief, as well as assert new claims, add new parties, or amend its pleadings as needed.

## FIRST CLAIM FOR RELIEF
### Breach of Contract (Against Tenuta, Franzen, Zamudio, Angelo, and Medina Only)

88. SCI and D4 incorporate by reference all allegations set forth above.

89. Tenuta, Franzen, Zamudio, Angelo, and Medina entered into valid and enforceable

contracts and agreements with SCI and D4.

90. The contracts and agreements Tenuta, Franzen, Zamudio, Angelo, and Medina entered into with SCI and D4 were supported by adequate consideration, including as a condition of their employment and continued employment and in consideration of their employment, continued employment, compensation, commissions, and other benefits retained by them and the sufficiency of which they expressly acknowledged.

91. SCI and D4 performed all required terms, conditions, covenants, and promises Franzen, Zamudio, Angelo, and Medina breached their Confidentiality and Non-Competition agreements, restrictive covenants, and other obligations in various ways including by: (1) planning, organizing, assisting and working for or on behalf of a business in direction competition with SCI and D4 in the prohibited Territory over five months before their coordinated resignations began; (2) using SCI and D4 resources for the benefit of Matter Discovery and themselves in the prohibited Territory during and after their employment; (3) directly and indirectly soliciting clients, potential clients, and suppliers for the benefit of Matter Discovery and themselves in the prohibited Territory during and after their employment, including long-standing and near-permanent clients they frequently worked with and directly contacted during their employment; (4) directly and indirectly soliciting, hiring, recruiting, and attempting to solicit persons employed by SCI that they worked with at SCI for the benefit of Matter Discovery and themselves; (5) directly and indirectly using, disclosing, taking, and reproducing Confidential Information to a direct competitor and/or third parties during and after their employment; (6) failing to faithfully devote all productive resources to performing their duties and by engaging in other business activities without consent, including assisting a direct competitor in targeting clients, potential clients, suppliers, and employees; (7) using, misusing, taking, concealing, and/or failing to return

company property, including the job tickets, job logs, the D4 Chicago Office van, hand dollies, company documents, business information, Confidential Information, equipment, and suppliers for the benefit of a direct competitor and themselves without authorization during their employment, upon the termination of their employment, and after; (8) intentionally deleting emails from their SCI email accounts, data from their SCI cell phones and other devices, job tickets, and other company documents and business information; (9) diverting clients, potential clients, jobs, and business opportunities to and for the benefit of Matter Discovery and themselves during and after their employment; and (10) intentionally concealing their conduct to provide more time to solicit SCI clients and employees, obtain equipment and supplies from SCI, D4, and third-parties, and utilize SCI and D4 resources.

92.  As a direct and proximate result of Tenuta, Franzen, Zamudio, Angelo, and Medina's breaches, SCI and D4 are entitled to temporary, immediate, preliminary, and permanent injunctive relief to prevent further breaches, as SCI and D4 have suffered and will continue to suffer irreparable harm as a result of losing clients, potential clients, suppliers, employees, equipment and supplies, competitive advantages, Confidential Information, goodwill, and other assets. These remedies would not be available, effective, or adequate except through this action. In addition, SCI and D4 seek all other available relief and damages under their agreements and/or allowed by law.

## SECOND CLAIM FOR RELIEF
### Tortious Interference with Contract (Against All Defendants)

93.  SCI and D4 incorporate by reference all allegations set forth above.

94.  Matter Discovery, Tenuta, Franzen, Zamudio, Angelo, and Medina knew SCI and D4 entered into valid and enforceable contracts with clients, employees, and suppliers.

95.  Matter Discovery, Tenuta, Franzen, Zamudio, and Angelo intentionally, willfully, maliciously, and without privilege or justification interfered with and instigated breaches of SCI

and D4's contractual relationships with clients, employees, and suppliers.

96. Matter Discovery, Tenuta, Franzen, Zamudio, Angelo, and Medina intentionally, willfully, maliciously, and without privilege or justification interfered with and instigated breaches of these valid and enforceable contracts, and induced or otherwise caused a failure to enter into, disruption, and violations of obligations owed to SCI and D4.

97. As a direct and proximate result of Matter Discovery, Tenuta, Franzen, Zamudio, Angelo, and Medina's conduct, SCI and D4 have and will continue to suffer damages, including irreparable harm for which SCI and D4 are entitled to temporary, immediate, preliminary, and permanent injunctive relief to prevent further interference and other harm. Absent such relief, any award would be ineffectual. In addition, SCI and D4 seek all other available damages and relief allowed by law.

### THIRD CLAIM FOR RELIEF
### Tortious Interference with Business Relationships and Opportunities
### (Against All Defendants)

98. SCI and D4 incorporate by reference all allegations set forth above.

99. SCI and D4 have valid and existing or prospective business relationships and opportunities with clients, potential clients, suppliers, and employees of which Matter Discovery, Tenuta, Franzen, Zamudio, Angelo, and Medina were aware at all relevant times.

100. Matter Discovery, Tenuta, Franzen, Zamudio, Angelo, and Medina intentionally, willfully, maliciously, and without privilege or justification interfered with SCI and D4's existing and/or prospective business relationships and opportunities and induced or otherwise caused a failure to enter into, disruption, termination, and violations of various opportunities and obligations with SCI and D4.

101. As a direct and proximate result of Matter Discovery, Tenuta, Franzen, Zamudio, Angelo, and Medina's conduct, SCI and D4 have and will continue to suffer damages, irreparable

harm for which SCI and D4 are entitled to temporary, immediate, preliminary, and permanent injunctive relief to prevent further interference, and other harm. Absent such relief any award would be ineffectual. In addition, SCI and D4 seek all other available damages and relief allowed by law.

**FOURTH CLAIM FOR RELIEF**
**Breach of Fiduciary Duty/Inducement of Breach of Fiduciary Duty**
**(Against Tenuta, Franzen, Zamudio, and Angelo)**

102. SCI and D4 incorporate by reference all allegations set forth above.

103. Tenuta, Franzen, Zamudio, and Angelo owed fiduciary duties to SCI and D4.

104. Tenuta, Franzen, Zamudio, and Angelo breached these duties.

105. These breaches were separate and apart from any actual or threatened misappropriation of SCI and D4's Confidential Information and trade secrets.

106. Tenuta, Franzen, Zamudio, and Angelo colluded, induced, and participated with fiduciaries of SCI and D4 in committing breaches of fiduciary duties, and obtained the benefits of those breaches.

107. As a direct and proximate result of Tenuta, Franzen, Zamudio, and Angelo's breaches and conduct, SCI and D4 have and will continue to suffer damages, irreparable harm for which SCI and D4 are entitled to temporary, immediate, preliminary, and permanent injunctive relief to prevent their further breaches and other harm. Absent such relief, any award would be ineffectual. In addition, SCI and D4 seek all other available damages and relief allowed by law, including attorney fees, exemplary damages, punitive damages, and compensatory damages.

**FIFTH CLAIM FOR RELIEF**
**Conversion (Against All Defendants)**

108. SCI and D4 incorporate by reference all allegations set forth above.

109. SCI and D4 have, and at all times had, an absolute right to the property in D4's

37

business, including orders from customers, equipment, suppliers, the D4 Chicago Office van, and other resources, tangible assets, and intangible assets.

110.  SCI and D4 made demands for possession of the property.

111.  Matter Discovery, Tenuta, Franzen, Zamudio, Angelo, and Medina wrongfully and without authorization assumed control, dominion, or ownership over the property.

112.  This conduct was separate and apart from any actual or threatened misappropriation of SCI and D4's Confidential Information and trade secrets.

113.  As a direct and proximate result of Tenuta, Franzen, Zamudio, and Angelo's breaches and conduct, SCI and D4 have and will continue to suffer damages, irreparable harm for which they are entitled to temporary, immediate, preliminary, and permanent injunctive relief to prevent further harm. Absent such relief, any award would be ineffectual. In addition, SCI and D4 seek all other available damages and relief allowed by law, including attorney fees, exemplary damages, punitive damages, and compensatory damages.

**WHEREFORE**, Plaintiffs demand the following relief:

A. Temporary, immediate, preliminary, and/or permanent injunctive relief:

1. Enjoining Defendants and those acting in concert with them from directly or indirectly destroying, hiding, deleting, damaging, converting, or otherwise disposing of any SCI or D4 Confidential Information, business information or records, equipment, supplies, tangible property, intangible property, or potentially relevant evidence within their possession, custody, and/or control, including any such information contained in computers, mobile phones, business or personal email accounts, cloud-based storage accounts, text messages, and other electronic devices.

2. Freezing and enjoining use of—until further notice—any financial assets, tangible equipment, and supplies in the possession, custody, and/or control of Matter Discovery, LLC to the extent they were obtained by or from Franzen, Zamudio, Angelo, Tenuta, and/or Medina and, if deemed appropriate, appointing a temporary receiver to prevent Defendants from dissipating or destroying such assets, equipment, and supplies and related evidence until further notice.

3. Enjoining Franzen, Zamudio, Angelo, Medina, and Tenuta and those acting in concert with them from directly or indirectly operating, conducting business for, providing services for or information to, working for, advising, or receiving any remuneration from Matter Discovery, LLC in violation of their Confidentiality and Non-Competition Agreements.

4. Enjoining Franzen, Zamudio, Angelo, Medina, and Tenuta and those acting in concert with them from directly or indirectly soliciting SCI or D4's clients or potential clients, or attempting to induce any such client or potential client to terminate its relationship with SCI or D4, in violation of their Confidentiality and Non-Competition Agreements.

5. Enjoining Franzen, Zamudio, Angelo, Medina, and Tenuta and those acting in concert with them from directly or indirectly hiring, attempting to hire, soliciting for employment, seeking to retain on an independent contractor or consultant basis, or in any way encouraging the departure, resignation, or other termination of employment of any employee of SCI or D4, in violation of their Confidentiality and Non-Competition Agreements.

6. Enjoining Franzen, Zamudio, Angelo, Medina, and Tenuta and those acting in concert with them from tortiously interfering with SCI and D4's contractual relationships, business relationships, and business opportunities with any of SCI and D4's clients, potential clients, and suppliers.

7. Requiring Defendants and those acting in concert with them to—within 72 hours of a corresponding Order—identify and describe all SCI or D4 Confidential Information, email accounts, computers, credit cards, mobile phones, vehicles, portable storage devices, business information or records, notes, reports, data, equipment, client lists, supplies, job tickets, job logs, inventory, and other tangible and intangible property, including copies of any such information contained on or in computers, mobile phones, business or personal email accounts, cloud-based storage accounts, text messages, and other electronic devices, that were directly or indirectly used, disclosed, taken, copied, accessed, and/or obtained, in whole or in part, by any of the Defendants in connection with conducting or planning activities for, or on behalf of, or in furtherance of Matter Discovery, LLC: (a) at any time during Tenuta, Franzen, Zamudio, Angelo, and/or Medina's employment with SCI; and (b) at any time after Tenuta, Franzen, Zamudio, Angelo, and/or Medina's employment with SCI.

8. To the extent any of the items in No. 7 are currently in the possession, custody, and/or control of Defendants, to turn them over within 72 hours of a corresponding Order: (a) to counsel for SCI and D4; or (b) to their counsel's office, which is where they shall stay until further ordered, and make them available for inspection by SCI and D4.

9. To the extent any of the items in No. 7 have been destroyed, hidden, deleted, damaged, converted, or otherwise disposed of, to identify and describe—within 72

hours of an appropriate Order—the circumstances including the known or approximate dates or current locations.

10. Requiring Defendants to identify and produce—within five days of a corresponding Order—all computers, mobile phones, portable storage devices, business and personal email accounts, cloud-based storage accounts, books and records, bank records, accounting records, accounting systems and data, and invoicing systems and data in their possession, custody, and/or control and directly or indirectly used in connection with the planning, setting up, and/or operations for, on behalf of, or in furtherance of Matter Discovery, LLC from June 15, 2019 to the present for an inspection and imaging by a qualified third-party forensic expert, which shall be reasonable in scope and timing, governed by appropriate protocol, and conducted pursuant to an Agreed Confidentiality Order with provisions similar to the form Model Confidentiality Order under Loc. R. 26.2.

11. Requiring Defendants to identify and produce within five days of a corresponding Order:

   a. All business and personal bank records, accounting records and data, tax returns, profit and loss statements, invoices, job tickets, job logs, work orders, communications (including emails, phone records, text messages, and data from mobile phone messaging applications), inventory records, and other records and electronic data reflecting or discussing: (i) actual or potential transactions directly or indirectly for, on behalf of, or in furtherance of Matter Discovery, LLC between Tenuta, Franzen, Zamudio, Angelo, and/or Medina and any client or prospective client of SCI or D4 with whom Tenuta, Franzen, Zamudio, Angelo, and/or Medina had contact with while employed by SCI; or (ii) equipment and supplies proposed, ordered, or obtaine by Tenuta, Franzen, Zamudio, Angelo, and/or Medina for or on behalf of Matter Discovery, LLC.

   b. All communications, including call records, text messages, emails, and data from mobile phone messaging applications, from June 15, 2019 to the present between: (i) Tenuta, Franzen, Zamudio, Angelo, and/or Medina and each other during their employment with SCI; (ii) Tenuta, Franzen, Zamudio, Angelo, and/or Medina after any of their resignations related to or referencing any client or prospective client of SCI or D4 with whom any of them had contact during their employment with SCI; (iii) Tenuta, Franzen, Zamudio, Angelo, and/or Medina, while directly or indirectly acting for, or on behalf of, or in furtherance of Matter Discovery, LLC or anyone other SCI or D4, with any client or prospective client of SCI or D4 with whom Tenuta, Franzen, Zamudio, Angelo, and/or Medina had contact with while employed by SCI; (iv) Tenuta, Franzen, Zamudio, Angelo, Medina, and/or any representative of Matter Discovery, LLC with each other or any SCI or D4 employee relating to or referencing hiring, attempting to hire, soliciting for employment, seeking to retain on an independent contractor or consultant basis, or in any way encouraging the departure, resignation, or termination

40

of employment of any employee of SCI or D4; (v) Tenuta, Franzen, Zamudio, Angelo, and/or Medina with any client, prospective client, or supplier of Matter Discovery, LLC that directly or indirectly references D4, SCI, the businesses or reputations of D4 or SCI, or any person that was employed by SCI or D4 at the time; and (vi) Tenuta, Franzen, Zamudio, Angelo, and/or Medina, while directly or indirectly acting for, or on behalf of, or in furtherance of Matter Discovery, LLC, with any supplier any of them had contact with while employed by SCI.

c. Records reflecting compensation, including any commissions, paid by Matter Discovery, LLC to Franzen, Zamudio, Angelo, Medina, and/or Tenuta from its inception to the present.

12. Ordering Defendants to show cause why a preliminary injunction should not issue pursuant to Fed. R. Civ. P. 65(b).

13. Ordering expedited discovery.

14. Ordering that the one-year restriction for Tenuta, Franzen, Zamudio, Angelo, and Medina's non-compete and non-solicitation provisions is tolled and/or equitably extended from dates of each of their resignations through the date of the injunction.

B.      Disgorgement, recoupment, and repayment of Tenuta, Franzen, Zamudio, Angelo, and Medina's compensation from SCI between when their unlawful conduct began and each of their resignations.

C.      An award of compensatory damages;

D.      An award of exemplary and statutory damages;

E.      An award of punitive damages;

F.      An award of pre-judgment interest and post-judgment interest; and

G.      Any other relief this Court deems just or proper.


Dated: March 5, 2020

Respectfully submitted,

*/s/ Tyler Tarney*
**GORDON REES SCULLY MANSUKHANI LLP**
Katherine P. Decker (ARDC #6323779)
One North Franklin, Suite 800
Chicago, IL 60606
T: (312) 796-2970; F: (312) 565-6511
kdecker@grsm.com

Tyler Tarney (Ohio Bar: 0089082) (*Admitted to U.S.D.C.*
*for Northern District of Illinois General Admission*)
41 South High Street, Suite 2495
Columbus, Ohio 43215
T: (614) 340-5558; F: (614) 360-2130
ttarney@grsm.com

*Counsel for Plaintiffs Special Counsel, Inc. and D4, LLC*

## **JURY DEMAND**

Plaintiffs request a jury with the maximum number of jurors allowed by law.

/s/ Tyler Tarney
Katherine P. Decker (ARDC #6323779)
Tyler Tarney (Ohio Bar: 0089082) (*Admitted to U.S.D.C.*
*for Northern District of Illinois General Admission*)

8011176_Transition/50411404v.1